Good morning, and may it please the Court, Robert Meyerhoff, on behalf of the Attorney General. The sensitive places provisions of Senate Bill 2 are all constitutional because for each there are relevantly similar historical analogs that fit within the nation's historical tradition of firearms regulation. Bruin requires nothing less and nothing more. In enjoining every provision of Senate Bill 2 that the plaintiffs challenged, the District Court ignored the expansive historical record built by the Attorney General. And in attempting to defend the District Court's sweeping injunction, plaintiffs have advanced a series of arguments that conflict with Heller, Bruin, and this Court's decisions applying those cases. Two errors stand out. First, plaintiffs' theory that sensitive places can only be those locations with government-provided armed security and strict entry and exit requirements cannot be squared with the fact that many locations that the Supreme Court has already recognized as sensitive, such as polling places, lack those features historically and still do not have them today. And plaintiffs' argument would flip Bruin on its head by defining the scope of the Second Amendment based on the policy choices of governments today rather than the nation's history and tradition. Second, plaintiffs take the extreme position that schools and government buildings are not sensitive places. Based on that premise, they contend that the Attorney General cannot analogize the places at issue here to those longstanding sensitive-place restrictions. But that position is incompatible with clear Supreme Court precedent and the position of the vast majority of other courts. Plaintiffs make other broad analytical errors, which I can address in a provision-by-provision explanation of why each of the challenge restrictions is constitutional. For example, for SB 2's restrictions on local and state parks, the Attorney General has identified numerous relevantly similar 19th- and early-20th-century historical laws which restricted the carrying of firearms in specified local parks, such as Central Park, Golden Gate Park, and Buena Vista Park, as well as laws which restricted firearms across state parks. And the Attorney General has put forward expert testimony from leading historians which establishes that those historical laws fit within the nation's tradition of firearms regulation. Counsel, is there some overarching standard that governs what makes a place sensitive in your view? And if so, what is it and where does it come from? So, Your Honor, we've looked to the five exemplars of sensitive places that Heller and Bruin identify. Those are government buildings, schools, legislative assemblies, courthouses, and polling places. And from those, we've drawn that there are three attributes that support a finding that a place is sensitive, the people who congregate there, the physical nature of the space, or the activities that take place there. But I want to be clear, we haven't shorthanded the analysis, the Bruin analysis, for any of the challenge-sensitive places provisions. For each sensitive place, we've identified, in many cases, numerous relevantly similar historical laws and explained how they fit within the nation's historical tradition. For new places or modern places, and Bruin talks about that, such as airports, for example, those in disho we've identified are helpful in analogizing, particularly under the more nuanced approach. The other question I have for you is, you mentioned that other courts have obviously dealt with this issue, and one of the recent ones is the Second Circuit, which issued, as I know you're aware, an exhaustive explanation of what is and is not a sensitive place. We're here predicting. We're not giving a final answer because this is a preliminary injunction. Is there any reason why, in that context, we shouldn't predict that the Second Circuit is right that we wouldn't create a circuit split and just follow their lead? Your Honor, we believe that the Second Circuit got it right, both in its analysis generally as well as to most of the specific places that were challenged under New York's law. Where we do diverge from the Second Circuit, or where we do think the Second Circuit got it wrong, is on the private property provision, and we think they got it wrong for two reasons. First, our reading of the Second Circuit opinion is that they interpreted Bruin's term of public carry or carrying in public to mean the modern any establishment, commercial establishment that's open to the public. And we don't think that's what the plaintext Stage 1 analysis, if you do that analysis as to the private property provision, what it should yield. We also think at Stage 2, the Second Circuit got it wrong on the private property provision. They highlighted the fact that the private property provision doesn't specifically mention commercial establishments and talks about premises generally or plantations. But we have record evidence in the form of a declaration from leading historian Leah Glazer, who talks about the idea that in the 18th century, America was a primarily agrarian society. There were much fewer of these commercial establishments open to the public. Many people worked from their home. And so we think the Second Circuit read too much in the absence of those provisions from the, or the absence of that language from those 18th and 19th century provisions because America looked very different back then. In terms of other analytical points that we think it's important for the court to address. I just want to get back to, I think Judge Graber's question was a little bit more nuanced than that though. But at the stage of a preliminary injunction proceeding, we would be creating a circuit split to essentially predict the likelihood of success on that issue. And as far as I know, no circuit has agreed on the private property default that it falls within the, I think there would be an opportunity still in this case to develop the record further on that issue. But on the preliminary injunction, is there, what basis is there for creating a circuit split? Thank you. Your Honor, of course, is correct that this is on a preliminary injunction. It's an interlocutory appeal. But we built an expansive historical record in the district court. We retained 13 experts, leading historians, not just in firearms, but in the specific sensitive places at issue, whether it's public transit, parks, casinos, or other types of places. So while this is a preliminary injunction, if you look at the record we've built, we have a compendium of over 200 laws. We think that that record would support a determination, both on the private property provision as well as the other provisions, that plaintiffs are unlikely to succeed on the merits of their claims. Okay. Let me flip this a minute. What isn't sensitive? I take it that the street isn't sensitive? That's correct, Your Honor. So public streets are not sensitive, public sidewalks are not sensitive, federal lands where carry is not restricted are not sensitive. Any private establishment that's not otherwise specified by SB 2, where the property owner permits carry, is not a sensitive place. And there are also exceptions in SB 2. For example, an individual can secure their firearm in their trunk or in a locked container in their car and drive into the parking lot of a sensitive place. It's also significant that under California law, you do not need a license to carry a firearm in your home, your place of business, and on private property that you own. And if we look back to the historical analogs, this is ultimately a historical test, we look at numerous 19th century laws which restricted carriage in places like school rooms or other places and they contained no exceptions for this sort of place of business. So I think ultimately it's a historical test and we're looking at comparable burden, comparable justification. Well, I was just thinking, we've had in the past couple of years several incidents where there have been shootings in areas where there had been a public gathering at a parade, a So those were all not sensitive places, right? Well, so there is a provision which restricts the carriage of firearms at permitted special events and public gatherings. And so I'm not sure about, I assume that the Kansas City parade, that that was a permitted gathering. I think the important piece about Bruin's discussion of public carry is it needs to be read in consonance with Heller. And so Heller presented the question, can you ban the quintessential self-defense weapon from the firearm, from the house, the handgun? And Heller said no. It left open the question of whether that firearm could be confined to the home. And Bruin answers that question. If you look at the first paragraph of Bruin, it says that handguns cannot be confined to the home. But plaintiffs, and we believe other courts, have overread what it means by public. I mean, we're sitting in a quintessentially public place, a courthouse, which other constitutional guarantees permit public access to. And yet the Supreme Court had no trouble finding that restrictions on courthouses were constitutionally settled. I think also if you look at the Bruin opinion itself, it quotes Morvey Madigan, a Seventh Circuit case, and it says, talks about the idea that you're more likely to be confronted on the sidewalk than on the 35th floor of your apartment building. And if we look at Justice Alito's concurrence, he talks about the idea that there might be a self-defense need on dark and dangerous streets. So the Supreme Court has provided guidance on what is a quintessential place, the streets and the sidewalks. In terms of other analytical points to address, in contrast to what plaintiffs have argued, it's clear from Bruin that the government need not identify numerous historical analogous restrictions in order to justify a modern regulation on sensitive places. We know this because Bruin talks about the need to identify a historical analog, not a dead ringer or historical twin, all using the singular. We also know this because in its specific discussion of sensitive places, Bruin says they're aware of few restrictions at legislative assemblies and polling places, and it cites to a law review article which identifies only Maryland restrictions from 1647 and 1650 as justifying the restriction on legislative assemblies, and only a single 1776 Delaware constitutional provision as justifying the restrictions on polling places. So if we read Bruin itself, we know that we don't need to identify a multitude of restrictions. It's also a significant lesson from Bruin that the absence of dispute as to the constitutionality of a historical law indicates that that law should be entitled to wait. And what we see here, we've addressed in our briefs, numerous 19th century and very early 20th century court cases which upheld restrictions on sensitive places, including the sum of the types of restrictions that are at issue here. And we have not found a case, plaintiffs have not identified a single historical case which reversed or held unconstitutional sensitive places restrictions. It's also important to note that this Court can consider territorial laws and local restrictions, both as the relevantly similar historical analogs, as well as evidence of the historical tradition within which those analogs fit. Another mistake plaintiffs have made is they forget that Bruin has two parts. There's the announcement of the new Bruin standard and the criticism of the old two-step test. There's also the application of that Bruin framework to the specific law in question in New York. And the Supreme Court identified that law in New York as being exceptional in one sense because it conditioned a right on the discretion of government authorities. And it said when there was countervailing, when there was overwhelming evidence of a countervailing tradition, territorial laws and local restrictions should be given little weight. But here, by contrast, we've identified numerous territorial laws and local restrictions. For example, with regard to permitted events, we've identified restrictions from 1889 in Arizona, 1893 in Oklahoma, 1887 in Stockton, Kansas. Those laws closely patterned State laws, including an 1869 Tennessee law, an 1870 Texas law, and more to the point, those laws were ch — those State laws were challenged in court, as I mentioned previously, and were upheld. So those territorial laws and local laws should be entitled to — to weight here. But how do you apply that standard to a casino? So Bruin talks about the idea of the more nuanced approach. And we read that to mean that whether — when there's dramatic technological change or unprecedented societal concerns, Bruin speaks in the disjunctive, courts can take a more nuanced approach. And we read that to mean they can analogize at a higher level of generality. And so it's important to note here that we haven't invoked the more nuanced approach for all of the provisions. We haven't invoked it, for example, for places of worship. We haven't invoked it for places where liquor is served for consumption on site. And where we've invoked it, we haven't just said the more nuanced — the more nuanced approach applies ipsit dixit. We've said, here are leading historians from the particular time period who, example, explain why parks emerged in the 19th century and are different in — in kind from earlier public spaces that existed. Additionally, I think it's important to frame the standard of what — how historical generations would have looked at restrictions. We can look at this court's case in — this court's decision in Alanez, where it talks about a historical restriction in question, and it says — it affirmed the constitutionality of that restriction because it said, this is the type of restriction that the founders would have tolerated. And I think that's significant because it goes to the point that the Second Circuit and Antonyuk made, which is the idea that reasoning from historical silence can be risky because legislatures don't necessarily legislate to their constitutional extremes. Indeed, we would hope they do not. I know you want to reserve time for rebuttal, but I did want to try and ask my question about the Second Circuit's decision a little more clearly. I think you're saying the one issue you really disagree with and how they resolved was the private property default analysis. Can you clarify what you think is the greatest error in what you — in your opinion, in the Second Circuit's analysis of that issue? Yes, Your Honor. I think, ultimately, the biggest error is at Stage 2. And as I mentioned, we believe they over-read what is in the statute and what isn't. And they say, well, there's no discussion of commercial establishments in a 1721 Pennsylvania law. Well, America looked profoundly different then, and there sort of weren't the historical establishment — there weren't the abundance of commercial establishments that exist today. And so if we think about Antonyuk's discussion of just sort of reading from the historical silence can be risky, that's a prime example of where that applies. So are you arguing that because of the — essentially the lack of the number of private establishments that are open to the public that, categorically, this fits into the more nuanced approach, and that the Second Circuit didn't do that? And yes, or just — can you put a finer point on it? No, Your Honor. I think another issue with the Second Circuit's opinion is I think their discussion of private property provisions comes too close to Bruin's admonition that we should not look for dead ringers. And I think this Court in Perez-Garcia is exactly right, where it says such an approach where we slice and dice the analogs and try to identify some minute difference, that really misses the forest for the trees. That divide-and-conquer approach, as this Court has said, is not appropriate. Rather, we examine the historical evidence as a whole, determining whether it establishes a tradition of permissible regulation. And it's notable that Perez-Garcia describes that tradition as sensitive places, generally. So you're looking at it more as there's just a lack of — there's some — the lack of regulation shouldn't be interpreted as the ending. I don't want to go too far, Your Honor, because we've identified seven restrictions from the 18th and 19th century that restricted the carriage of firearms in exactly the same way. So if we think back to Bruin, thought a single Maryland colonial restriction or two Maryland colonial restrictions from a century and a half before the founding were sufficient in the absence of dispute to affirm that restriction, we certainly think seven restrictions from a variety of states in the 18th and 19th century is sufficient. Okay. I understand. Thank you, Your Honor. Thank you. Anything else? Good morning, and may it please the Court. Alexander Frank for the May appellees. Contrary to the state's argument that the district court's order in joining SB 2 did not follow the Supreme Court's Bruin decision, the reality is that the district court's order is one of the most Bruin-compliant decisions issued in any district court anywhere since Bruin. Bruin's requirements are not complicated. Bruin simply reaffirmed Heller, which established that the scope of Second Amendment rights today is determined by the scope the Second Amendment was understood to have at the time that it was ratified. It's a text, history, and tradition approach. It is not an interest-balancing approach, which asks if the Second Amendment right today is really worth insisting upon. And what that means is that if Second Amendment activity is implicated, and there is no question that it is implicated here, then the challenge law survives only if the state defendant can successfully marshal evidence of a well-subscribed historical regulatory tradition that approached the same problem in the same way with a comparable burden on the right to self-defense. And not one of the challenge subdivisions here survives this historical scrutiny. The state ---- Sotomayor, what is your response to the argument that in Bruin itself, it used the singular in talking about a historical analog, not historical analogs, and that it didn't require a twin, but rather something analogous? I don't think that your initial comments really took that into account. If I've understood the Court's question, I believe it is the Court suggesting that the state's burden as far as when they have to go to history and marshal the evidence that they can supply one analog? That is my question. Why is that not sufficient if there is an analog? Because Bruin was expressly clear that state defendants must marshal evidence that a particular type of regulation from history was well-subscribed. They cannot simply point to one regulation. But they also used a singular term, looking for an analog and not a twin. The Court announced two approaches to history. They want to see well-subscribed historical analogs when, during the ratification era, the same problem existed. That's when the Court used the dead ringer language, right? They want to see evidence that they approach the same problems the same way. So when the problem existed then, right, we don't trigger analogical scrutiny. Analogical scrutiny applies when society is facing a novel societal concern or a dramatic technological change, which makes it more or less impossible to go back to the ratification era and find something similar. It's that circumstance that state defendants may analogize. They may speak more broadly, and they may say, this was a similar problem, not quite the same one, and therefore, this modern regulation is of a piece with that and therefore survives scrutiny. And I'm going to ask you the same question I asked opposing counsel, because we're not giving a definitive answer in the context of a preliminary injunction appeal. We're looking only for likelihood. And in that context, why should we part company with the Second Circuit? In other words, why wouldn't we predict that our court would not choose to come to a different conclusion and create a circuit split? I would strongly caution this Court against using the Second Circuit case to inform this court here. That court made some serious, serious errors in assessing that law. There were at least three very important ones. The first one is that it gave undue deference to territorial regulations. Bruin said we shouldn't do that. In fact, of the 12 or so laws the State of New York presented when it made its effort to marshal evidence in support of the Sullivan Law there, many of them were territorial restrictions, and the Supreme Court said, we're not going to look at those. We're not going to look at pre-union admission regulations, because they don't inform what people thought about the Second Amendment, and they don't inform the American tradition. They might be probative in some ways, right? But they don't have much weight. Well, I don't understand why they don't inform tradition. I understand why they might not inform the meaning of the amendment. But aren't they, by definition, part of the American tradition? No. Bruin says that we want an enduring tradition of State regulation, States meaning States admitted to the union. Bruin doesn't authorize a freewheeling hunt for any probative, any probative enactment. It wants to see State regulations. And the second error that was very clear in the Second Circuit opinion was that it completely disregarded how Bruin said to apply the analogical standard. The Supreme Court is clear that the analogical approach applies when we're dealing with novel social concerns or dramatic technological departures that the founding era really couldn't have envisioned. And it said, no, we'll use the more loose analogical standard wherever we please. That was flatly wrong. And then the third issue is that the court entertained the idea that crowded places, the fact that a public place could be sufficiently crowded, would strongly suggest, if not define it as a sensitive place. And that flies in the face of Bruin. And even the Chief Justice himself at our argument said that that can't work because the island of Manhattan is a very crowded place and has lots of police. So it can't simply be that if a place is crowded that it's a sensitive place. So here, the State has failed to show that any of these locations that SB2 attempts to claw back from this very broad right to be armed outside the home that Bruin established are genuine sensitive places under the correct application of historical scrutiny. And that ultimately is why the State's entire defense in this case requires distorting Bruin's amendment to historical scrutiny as supposed to be applied and then refashioning dicta from Heller as dispositive holding here. The State expressly argues that the government need not identify numerous historical analogs to justify a modern regulation of sensitive places. But there is no good faith way to read Bruin to reach that conclusion, which is why the State relies on a distortion of Heller to make the argument. In Heller, the court said that schools and government buildings are presumptively sensitive places where firearms might lawfully be prohibited. But according to the State, it isn't really clear whether such regulations were sufficiently well historically subscribed to past scrutiny. And so, the State concludes that historical scrutiny doesn't truly apply. Not so. The State fundamentally misunderstands, or worse, misrepresents Heller when it talks about what Heller said about schools and buildings. Heller said these places were presumptively sensitive, not conclusively. And second, Heller was about whether — Oh, is it your position that schools, for example, that that is not a sensitive place? We're not challenging the school's provision here. Because? Because there's plenty of SB 2 that is, I think, more appropriate to challenge than schools. I think — Not because the Supreme Court said in Heller that it was presumptively lawful? Constitutional? The Supreme Court said it was presumptively. Right. And so, what would overcome that presumption? Well, the text, history, and tradition approach needs to be applied to that question when it arises before a court and the issues squarely before a court. It's not a carve-out. The court wasn't answering the question in Heller of whether or not schools are sensitive places. The court was simply answering whether the individual rights theory of Second Amendment rights versus the collective rights theory under the so-called Militia Clause was correct. And we know how it held. It established there's an individual right to be armed inside the home for self-defense. And Bruin is the corollary to that. It just extends it beyond the home. So, given that that question was left for another day, Bruin — Heller established what the test would be for that other day. It would be the text, history, and tradition approach. So, it's upon this — this attempt to refashion Heller's — Heller's dicta into — into a dispositive holding that — that flouts the need to apply the historical scrutiny approach that the — that is the basis of the — of the State's defense here. The State flat-out says that courts should not limit their analysis to State laws that were on the books in 1791 or 1868 and should consider any probative evidence. But Bruin could not have been any clearer that that's what it's searching for, as we discussed. It doesn't want to know about non-Union territories, what they were doing, or what a few towns were doing when they enacted ordinances, or what private companies were doing. And it carries — Are we — I'm having a little difficulty understanding what standard we're supposed to apply as to what is sensitive. We're dealing with a constitutional provision of the Second Amendment, which presumably applies to the entire country. And yet, we're dealing with regulations, you say, that have to be State regulations. But the States, historically, were very different. And so, how do we get, by looking at these — the State regulation, how do we get to a standard that applies nationwide, in your view? Well, we need to see a well-subscribed tradition among the States that they approach a similar problem in a similar way. That's how. So, if one or two States or one or two towns enacted an ordinance that addressed a We want to see a well-subscribed historical regulatory tradition. And, Counsel, I believe the clock has not spliced, so I believe your time is up. It has. I am — I am up. Thank you for the Court's time. Good morning, Your Honors. Pete Patterson for the Carrillo Appellees. I'll start with why this Court should not follow Antoniak. There's two reasons. One, we are on a P.I. The purpose of the P.I. is to maintain the status quo. And here, the status quo is that law-abiding Californians who are licensed to carry firearms in public could carry in all these places. And we've shown at least the likelihood of success. So, while this litigation — Well, that's — that is the question that we're facing, is what is the likelihood of success. And the analysis of that question was what was at stake in the Second Circuit as well, because it also was a preliminary injunction — Correct. — appeal. So, I'm not — so, what you're really saying is that somehow because the district court said so, that's where we are. But we — aren't we supposed to assess independently from the district court what we think the likelihood of success is? Absolutely. I'm just saying that should be kept in mind. But then there are specific historical errors that the Second Circuit made that undermine its entire opinion. First, the Second Circuit said that carry could be banned in crowded places based on the language about fairs and markets in the Statute of Northampton and analogues. But Bruin interpreted that to say only when that carrying is done in a terrifying manner. So, that is a clear historical error that knocks out the entirety of the founding-era evidence that Antoniuk had. Second, Antoniuk relied on four laws passed between 1869 and 1875 in former slave-holding states that broadly banned carry in public assemblies. But again, Bruin has already rejected the rationale of those laws because it said a place where the public congregates is not sufficient to establish that place as sensitive. And yet, that was the rationale for each of those laws, which explicitly barred carrying in all places of public assembly. So, that knocks out everything that Antoniuk had for crowded locations. Next, Antoniuk relied on the language about schools in Heller and Bruin. And, again, yes, Heller and Bruin did have that language. But what it didn't have is what the contours of the acceptable regulations in schools were or what the historical justifications for those regulations were. I mean, if we look at history — Wait a minute. Wait a minute. Do we have to know what the justifications are? Suppose, you know, 11 states back in 18-whatever banned firearms in schools. Do we have to know why they did it, or is it sufficient to know that they did it? We have to know how and why, because when we're comparing situations — Why do we have to know why? Where do you see that in Bruin? If — I mean, what you were arguing earlier is there has to be a clear trend, if you will, of historical regulation. And if there is, I don't understand why we have to know what they were thinking. We have to figure out the principle that justified that regulation and then apply it today. So to go back to that, if there were evidence that 11 states out of however many there were back then all absolutely banned firearms in schools, you would say that's not sufficient to ban firearms from schools now. Bruin says we have to know how and why. Okay. So we have to know those. What is the answer to my question? With respect to schools? Yes. Yes. With respect to schools, it is because — So that would be — I asked you whether that would be sufficient to establish a historical pattern that would suffice to allow that ban today. Is your answer yes or no? It is no, because we have to look at how and why. And we can see this in Bruin's treatment of handguns, because Bruin had some laws that allegedly banned handgun carry at the founding. And what Bruin said is, well, what the principle is is that dangerous and unusual weapons can be banned. And maybe handguns were dangerous and unusual weapons then, and they're not today. So in the school context, maybe there was some principle that was present then that's not present now. That would be evidence, of course, those 11 schools or states, but you would need to see why. And if we look at the principle with respect to schools, at the founding, all of the restrictions in schools were on students. And as California's own experts admit, they were based on the school's in loco parentis authority. And the reason that's important here is because California is trying to use the school example to say, we can ban firearms in places where vulnerable people are present. But that was not the rationale at the founding. The rationale in the school's context was that there was — Well, why isn't that the exact rationale? Because in loco parentis exists because the children are vulnerable and are in need of the protection of the institution. Isn't that the very definition of being vulnerable? Well, when — so in that instance, the schools have that authority. But when there is not in loco parentis authority, and the other individuals in the location present maintain that authority, then yes, they have the obligation to protect their children and other vulnerable individuals. And we can see that California's rationales are all explicitly refuted by founding-era evidence, because they say we can ban carry in places that are crowded, where other constitutionally protected activities take place, and where there are vulnerable people present. And there was one place that very well fit those criteria in the colonial era and founding, and that was churches. And what we see is in those locations, colonial and early colonial governments mandated carry in those locations. Never was it banned. So the solution, if there's a vulnerable location, if there's these other attributes present, is to arm people. And that makes sense, because if you have vulnerable people in a location and then say nobody can be armed, that only makes them more vulnerable. And there were questions today about the extent of laws that are needed to just to provide an analog. And this Court's precedent in Baird v. Bonta says that it has to be something that was broadly in effect at the time of ratification. It was the language used in Baird v. Bonta. And we can, and from Bruin, to be sure, spoke about an analog. But the reason it said that is because courts can look at an analog that fit within a broader tradition that was broadly in effect. So I will provide an example. And this is an important example, the 1786 Northampton Analog in Virginia. And what the Supreme Court said was that this was essentially a codification of the common law, is what it said in Bruin. And so the common law is a tradition that's generally in effect. And so this law, Bruin says, codified the common law. And so this is an important analog to look at. And what this analog says is that with respect to places like fairs and markets and other general public places, carry is only restricted when it's done to terrify the public. It's not generally restricted. Counsel, how does your reliance on the common law fit with your questioning of the private property distinction that this addresses? There was no distinction at the common law. There was nothing that would have restricted the carrying on private property, particularly private property open to the public. In fact, the common law, Blackstone said, people, unlike other areas open to the public, places like inns and those sorts of places, people had a right to enter. So the common law was people could go into those sorts of places. But the first half of the 1786 Virginia statute was more of a strict restriction on carry. And what it said is that people couldn't carry firearms in courts of law except for the justices themselves and their assistants. So what that shows is that there are certain places where people couldn't carry firearms. But the understanding was that the government itself would be securing those places. And that's why we think this comprehensive security test is the test that unifies the examples that the Supreme Court has given. And it also makes sense with respect to the purposes of the Second Amendment. Heller has said that the core component of the Second Amendment is self-defense. And so if the government takes on the burden of defending a place, what it looks like to get into this courtroom today, what it takes to get onto an airplane and actually secures a place, then that need for self-defense is not present because the government is doing it. But if the government does not do that, then that need is still in place. And so we look at that founding principle of security as reflected in the 1786 Virginia law, which codifies the common law, and we apply it today and see, is the government comprehensively securing a location? And if the government is, then the government can ban firearms there. That's why the government can ban firearms in this courtroom. So let me see. I have... So you had a right to carry on to an airplane before TSA set up the checkpoint? Yes. And that is a social change. So Bruin says we look at social changes. And up until there was that requirement, there was no tradition, no historical practice of So at the founding, there was not. And what is good about this test is it an objective test. It doesn't require the courts to do interest balancing by looking at a location and saying, okay, is there something about this location that in our assessment, we're balancing and we think it would be more important to ban firearms from here than to allow them from here. That's the kind of reasoning that Bruin does not allow. But what this is just looking objectively, is the government securing a location? And if it is, firearms can be banned there. If it's not, they cannot. I see my time has expired. Thank you. Thank you, Your Honor. I think at first it's important to note that this injunction is not in line with Bruin. It is a sweeping injunction that goes far beyond an injunction issued by any other court post-Bruin in the sensitive places context. It prohibits the state from restricting firearms on playgrounds, in the parking lots of nursery schools, and indeed the court in joining all of the parking lot restrictions, even at jails and nuclear facilities, questioned whether the state had any authority to restrict firearms at parking lots or in buffer zones. But numerous courts pre- and post-Bruin have cited the same laws that we've cited in our brief in upholding buffer zone provisions that are actually much broader than ours. For example, the federal restriction on carrying firearms within 1,000 feet of a school. I think it's important to look back at Bruin as well. One of the appellees' counsel mentioned the Chief Justice's statement there. Well, Bruin rejected the idea that New York State could declare an entire jurisdiction, the island of Manhattan, as a sensitive place, including the streets and sidewalks. We obviously have not done that here, and indeed the appellee's counsel brought up the Chief Justice. Well, the Chief Justice suggested strongly that stadiums were a sensitive place. It was a no-brainer according to the transcript there. I think the in loco parentis argument is one that this court should reject. It relies on the fact that plaintiffs make the argument to this court that the restrictions on schools historically permitted teachers to carry firearms. That's simply not the case. We've identified restrictions throughout history, an 1870 Texas law, an 1874 Missouri law, and an 1891 Vermont law, which didn't contain an exception for teachers. And indeed, we've cited a case called Alexander in our briefs, a 19th century case that found that had affirmed a conviction of a schoolteacher and said it would be pernicious to allow school teachers to carry firearms in courthouses, excuse me, in schools. The one other thing I'll add is on the private property provision, we think the Second Circuit also ignored two dead ringers, a 1763 New York law, that's an excerpt of Record 607, and a 1771 New Jersey law, that's an excerpt of Record 612. And those were not limited to open lands. I think the final point I'd like to make is that we have not shorthanded the analysis as to any of the challenge provisions. We haven't said playgrounds are like schools, so you don't need to do the Bruin analysis. For each of the challenge provisions, we've identified the relevantly similar historical analogs and fit them within the nation's tradition, explained why, based on secondary sources, which, of course, Heller and Bruin considered as well as other laws, why these restrictions fit within the nation's historical tradition of firearms regulation. And I'll repeat what I said in my opening. Bruin requires nothing less and nothing more. And we've done that for each of the challenge provisions. The injunction should be vacated. Thank you, Counselor.
judges: SCHROEDER, GRABER, SUNG